## Shearer's Dairies, Inc., v.
## Pennsylvania Milk Control Commission

*M. J. S. Stoney* and *W. B. Saul*, of *Saul, Ewing, Remick & Saul*, for appellant.

*John Patrick McShea, Jr.*, for Milk Control Commission.

FLOOD, P. J., May 27, 1959.—This is an appeal from an order of the Pennsylvania Milk Control Commission suspending appellant's milk dealer's license for a period of 60 days. The order is based upon a citation which charges that appellant violated section 807 of the Milk Control Law of April 28, 1937, P. L. 417, 31 PS §700j-101 et seq., by selling milk to several of its customers at prices below the applicable minimum prices fixed by the commission: 31 PS §700j-807. The commission's original order suspended appellant's license for a total period of 90 days. Pursuant to statutory authority the commission granted leave for appellant to pay a penalty at the rate of $50 per day for each day of suspension in lieu of the actual suspension of its license: 31 PS §700j-404.1. Appellant paid a penalty covering the 30 days' suspension applicable to its transactions with two of its customers, the Drexel Brook Swimming and Tennis Club and the W. T. Grant Co. It has appealed the remaining 60 days' suspension which was imposed by reason of its transactions with the Stouffer Corporation and the Frankford Grocery Company.

The Milk Control Law provides that, on appeal from an order of the commission, the case shall be heard by the court on the record certified by the commission. It also provides that the court shall determine whether or not the order appealed from is "reasonable and in conformity with law" and that appellant has the "burden of proving" that the order appealed from is unreasonable or illegal: 31 PS §700j-906.

In support of its order the commission has filed a comprehensive adjudication containing findings of fact, conclusions of law and a full discussion of its findings and the legal issues involved. A careful study of the adjudication in the light of the arguments presented to us convinces us that, in view of the limited

scope of our review, the adjudication of the commission should be affirmed. In both cases discussed below the situations are of the type in which the administrative determinations based upon experience in the field should not be lightly disregarded. We find that they are reasonable and in conformity with the law and approve them . . .

2. The Frankford Grocery case involves an agreement whereby appellant pays the Frankford Grocery Company 10 percent of its receipts attributable to sales of milk to Frankford's retail-grocer members in exchange for the performance of certain services by Frankford. The pivotal issue presented in this phase of the appeal is whether the milk contract executed between appellant and Frankford was a method or device which had the purpose and effect of illegally reducing the price which Frankford's members paid for their milk.

The contract in question purports on its face to establish an agency relationship between appellant milk dealer and Frankford whereby the latter agrees for a commission to render certain services for appellant. The services for which the commission is paid were specifically designated to be as follows: (a) Soliciting sales for appellant of milk, cream, chocolate milk and buttermilk to persons acceptable to Frankford; (b) investigating and approving the credit ratings of the customers so solicited and guaranteeing the payment of the bills of these customers with respect to the sale of the aforementioned products; (c) collecting all bills of the customers for these products and remitting the amount thereof weekly to appellant; (d) servicing such customers' accounts and arranging for times of deliveries to said customers; and (e) advertising the aforementioned products under the "Unity" label in regular issues of the "Unity" Bulletin. In addition there was a provision in the contract requiring that all of the specified products were to be

sold and distributed by appellant to customers solicited by Frankford, unless otherwise designated under Frankford's "Unity" label, and that no other person would be granted the right to sell the specified dairy products under this label.

Frankford is a coöperative purchasing and marketing association organized under the business corporation laws of Pennsylvania to purchase goods in large quantities and thereby eliminate the wholesaler's profit and enable the coöperative to compete with chain stores. Its articles of incorporation provide that the purpose of the corporation is to act as a purely coöperative enterprise of retail grocers, although it performs some other noncoöperative corporate functions. Except for some 300 odd shares owned by its officers and employes, the corporation is controlled by approximately 2,000 retail grocers in Philadelphia and vicinity. From an operational standpoint every retail-grocer-member stockholder of Frankford is obligated to buy sufficient capital stock in the company to cover his average weekly purchases or withdrawals of merchandise and to deposit the stock with the company in escrow and then pay his bills weekly. The company employs no salesmen and all orders are received by mail or in person on written order blanks. Each member receives only one weekly delivery. The withdrawal price of merchandise to grocer members is determined as near to cost as possible. Usually at the end of a fiscal year there is an excess of receipts over total costs. This fund is distributed to members in proportion to the withdrawals they have made, as a patronage dividend. For over 35 years Frankford has established and promoted a "Unity" brand name which it owns and which represents a valuable good will.

The contract before us is applicable only to those dairy commodities with respect to which the commission fixes minimum prices. It is significant that on the

same day that this contract was executed the same parties executed another contract which applied to all the uncontrolled products handled by appellant. The second contract differed from the first in three respects. It was silent as to the rendition of services, it provided for no so-called commission payments and under its terms deliveries were to be made to Frankford directly instead of to the individual grocer members.

The testimony relating to Frankford's general operations and particularly its operations under the ice cream contract when contrasted with the services performed under the milk contract cannot be ignored in determining the real purpose and effect of this transaction. Considering each of the services seriatim the commission's conclusion that they were a form of price concession seems justified.

(a) The solicitation services performed by Frankford under paragraph (a) of the milk contract consisted of 10 missionary salesmen calling upon the grocer members, mentioning the fact that the association had "Unity" milk as well as all other "Unity" products. There was also testimony by the president of Frankford that the interest and work of all people in the company would be directed to the promotion of its own brand of milk the same as its own brand of any other product. This testimony indicates that all of these alleged solicitation services were rendered equally to ice cream and all other products bearing the "Unity" label and yet, as far as the record reveals, there is no service or commission payment with respect to the latter.

(b) Inasmuch as Frankford has historically devised its own system of eliminating credit losses by requiring each grocer upon admittance to the association to purchase sufficient capital stock to cover his average weekly purchases, it appears that paragraph (b) of the agreement merely puts appellant in the same position in which it would have been placed if it dealt through

Frankford as a coöperative bulk purchaser, as did all or almost all of the other suppliers of the products its members sold. There was no charge for this service under the ice cream contract. This again indicates an intention to change the form of Frankford's usual method of dealing without changing the substance of the transaction, except to achieve the quantity discount which the act forbids under the guise of performing a service which was performed gratis for the other suppliers.

(c) The same reasoning holds true for paragraph (c) of the milk agreement wherein Frankford agreed to make collections and remittance to appellant for all weekly milk deliveries. Because of Frankford's corporate structure and preëxisting credit assurance there was never any real doubt that appellant would be paid weekly the same as any other Frankord supplier and Frankford merely did for appellant what it did in a different form for the other suppliers.

(d) Paragraph (d) of the agreement again illuminates the transaction and makes it appear an effort to set up a procedure to circumvent the act. The milk contract differs from other supplier contracts into which Frankford has entered in that under the milk contract deliveries are made not to Frankford but directly to the retail grocer members of Frankford. Ordinarily the suppliers deliver the merchandise directly to Frankford, whereupon Frankford breaks down the bulk shipments into individual orders and in turn makes delivery to the member customers. Under the contract here, Frankford does not have to make deliveries, but only arranges the time for deliveries in accordance with the requirements of Shearer's delivery schedules. It would seem that this saves Frankford the expense of making deliveries to the individual grocer outlets, which it does in the case of other suppliers and that this provision represents a benefit to

Frankford for which it should pay Shearer, if any payment is to be made, rather than the reverse.

Lastly, the so-called advertising service, which the record discloses consisted of listing "Unity" milk in a price sheet or bulletin, was a service performed, perhaps in varying degrees, for all suppliers whose product was sold under the "Unity" label. There are hundreds of such products. None of these suppliers had contracts identical to the present one and with respect to ice cream it is admitted that there was no commission payment for listing this commodity under the "Unity" label. The ice cream contract offered appellant's affiliate company the exclusive right to use the "Unity" label on its ice cream, as did the contract before us with regard to appellant's dairy products. Appellant argues that part of the consideration paid by appellant in the form of a commission went for the purchase of a valuable trade name, "Unity". The question arises why no consideration was paid for this right or privilege under the ice cream contract. Since the identical services performed by Frankford under the milk contract are performed by it under the ice cream contract without a commission, it is a reasonable inference that the commission payment was a method devised to cloak the reality of the discount normally received by the coöperative when it buys noncontrolled products in large quantities. It appears that this was the method of attempting to do, in the purchase of milk, what it did in the purchase of other items. Unfortunately for appellant the act forbids it.

Mr. Heim, the president of the association, testified that the agreement came into being because in his opinion his members "needed some help in the field of milk as in all other fields because of the serious competitive situation. I felt that ultimately we hoped to be in the milk business if that was practical . . .". While denying that price was a factor when Frankford

entered into contracts of this nature, Mr. Heim testified concerning a bread contract with another supplier somewhat similar to the milk contract that ". . . we have a bread contract that was developed as a result of my personal insistence on getting into the bread business because as you probably all know, our small stores were out of competition by having to get about 6¢ a loaf more for the same loaf of bread as was procurable in super market competition."

Although Frankford in form might appear to be performing a corporate function, it appears to us that in substance it is acting under the agreement in a coöperative capacity. Certainly we cannot say that the commission was unreasonable in so concluding and in determining that the agreement was a device to evade the act.

The moneys collected by Frankford from appellant have been placed in a special escrow account. Since the record does not show the added cost to Frankford of performing its undertaking under the agreement, the amount of its profit thereunder, if any, is unknown. Any such profit will not be available for distribution by way of patronage or stock dividends under the by-laws of Frankford, which have been amended to provide that any profit which may result to Frankford in its corporate capacity will be added to Frankford's surplus. Appellant argues that these factors should prevent a finding of any discount to the actual purchasers of the milk. Under the circumstances present here we do not believe that the commission should be required to produce data showing the actual cost to Frankford of the services it performed. The amount of the payments and the nature of the services support, we think, the inference that the payments to Frankford exceeded substantially the cost to it of performing the stipulated services. Appellant produced no evidence disclosing a cost approximating the re-

ceipts. Conceding arguendo that Frankford's profit on the transaction is not available for distribution directly to its members, we have little difficulty in agreeing with the commission's finding that most, if not all, of the profit inures to the ultimate benefit of Frankford's retail-grocer members.

Appellant argues that there is nothing in the Pennsylvania Milk Control Law which prohibits it from employing the Frankford Grocery Company to perform valuable promotional and financing services for it or which prohibits that corporation from departing from its ordinary "coöperative" function and engaging in a transaction such as this with a milk dealer. There might be no objection to this were it not for the fact that the corporation here is owned and controlled by the dealer's prospective customers, who are stockholders and ultimate beneficiaries of any financial advantages received by the corporation. Under these circumstances the ultimate effect of the transaction is the allowance of rebates which swell the pockets of the customers. On the other hand in Sylvan Seal Milk, Inc. v. Pennsylvania Milk Control Commission, 74 D. & C. 289 (1951), cited by appellant, the alleged financial benefits to the customers were offset by the detriments suffered by them, the purpose and effect of the transactions were merely to increase the customers' sales of milk, thereby benefiting both dealer and customer, and the only real benefit or profit which the customer might anticipate would have to come from increased sale of milk.

While the Milk Control Law does not prohibit dealers from expending sums to increase their volume of sales, it does prohibit the use of rebates to customers, whether direct or indirect, to accomplish this purpose. Where the effect of a transaction is to swell the pockets of a customer other than by increasing sales of milk, the commission is amply justified in pro-

ceeding against the dealer under section 807 of the act.

Finally, we cannot hold the transaction to be legal or the commission to be unreasonable merely because only approximately one-fifth of Frankford's grocer members have purchased appellant's milk. The fact that the rebate is diluted or that all of it does not reach the customer does not alter its character as a rebate.

*Order*

The order of the Pennsylvania Milk Control Commission is affirmed; the appeal is dismissed.